UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

ONDREA B. SHAVER                    )
                                    )
V.                                  )          NO. 2:14-CV-92
                                    )
CAROLYN W. COLVIN,                  )
Acting Commissioner of Social Security   )

## REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders

of the Court and 28 U.S.C. § 636 for a report and recommendation. The plaintiff's

applications for Supplemental Security Income and Disability Insurance Benefits under the

Social Security Act were administratively denied following a hearing before an

Administrative Law Judge ["ALJ"]. The plaintiff has filed a Motion for Judgment on the

Pleadings [Doc. 14]. The defendant Commissioner has filed a Motion for Summary

Judgment [Doc. 18].

The sole function of this Court in making this review is to determine whether the

findings of the Commissioner are supported by substantial evidence in the record.

*McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988).

"Substantial evidence" is defined as evidence that a reasonable mind might accept as

adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971).

It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the

conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime*

*Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve

conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d

383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 37 years old with a high school education at the time of the decision of the Administrative Law Judge ["ALJ"] denying her applications. There is no disagreement that she cannot return to her past relevant work.

On February 5, 2013, in Case no. 2:12-CV-73, a judgment was entered in this Court remanding the plaintiff's applications for benefits to the Commissioner for further determinations. The district judge ordered that the case be remanded to the Commissioner "for the Administrative Law Judge to address fully the opinion of Dr. Valley, for a consultative physical examination to determine the plaintiff's condition and restrictions on her work related activities, and for the plaintiff to submit any further evidence." *See*, Case No. 2:12-CV-73, Doc. 17. The present case is an appeal from Commissioner's denial of those applications incident to that remand.

Plaintiff's medical history is summarized in the Commissioner's brief as follows:

> In June 2004, David Wiles, M.D., a surgeon with the East Tennessee Brain and Spine Center, P.C., operated on Plaintiff's back (Tr. 177). She had a history of chronic low back pain that had progressed despite conservative treatment (Tr. 177). A magnetic resonance imaging (MRI) scan of Plaintiff's lumbar spine showed mild degenerative disc changes at the L4-L5 and L5-S1 levels (Tr. 177, 185). There was no evidence of spinal canal or neuroforaminal stenosis or disc herniations (Tr. 185).

2

Dr. Wiles performed a discography and fusion in the hopes of improving Plaintiff's severe pain (Tr. 177, 187).

At her two month follow-up, she reported that her pain was largely unchanged and that she had "not really noticed much improvement" (Tr. 195). Upon radiological review, the screws and cages were aligned and in place (Tr. 195). Dr. Wiles prescribed Neurontin and Soma for the muscle spasms in her back and Percocet for pain (Tr. 195). At her three month follow-up in September 2004, she responded that her back pain still bothered her "a little bit" but overall she was improving, and she rated her back pain as 40 to 50 percent better (Tr. 196). She worked at a computer and sat most of the day, and planned to return to work over the next four to six weeks (Tr. 196). At her four and a half month follow-up, she reported she was "doing pretty good" and had "just a little" back pain (Tr. 197). Dr. Wiles released her back to regular duty, noting that she did not have any strenuous work at her job and was an office worker (Tr. 197).

In December 2004, Plaintiff told Dr. Wiles that when she returned to work, her pain increased until it was equivalent to what it was prior to surgery (Tr. 198). Dr. Wiles stated that he thought her pain was secondary to going back to work and that he was very optimistic about her progress and her long-term prognosis (Tr. 198). He prescribed Percocet and Soma for pain relief (Tr. 198). In February 2005, Plaintiff complained of worsening pain on the left side of her back that radiated into her left leg, and that the pain was worse than the pain she had prior to surgery (Tr. 200). She had been unable to work or ambulate for several days (Tr. 200). She rated her pain as a 7 on a 10-point pain scale (Tr. 200). Dr. Wiles administered a steroid injection (Tr. 199), which provided 100 percent pain relief for 2 or 3 days before the pain gradually returned (Tr. 205). Dr. Wiles administered another injection the next week (Tr. 205).

Plaintiff returned eight months later in October 2005, and reported that her low back pain had been getting progressively worse over the last few months (Tr. 206). She was not taking any medication and rated her pain as a 7 on a 10-point pain scale (Tr. 206). Her gait was antalgic, with limping on the left side (Tr. 206). German Levin, M.D., an associate of Dr. Wiles, performed a left sacroiliac joint injection and a left greater trochanter bursa injection (Tr. 206). Several minutes after the injection, Plaintiff became tearful, stating that her severe pain significantly interfered with her activities of daily living, sleep, and personal relationships (Tr. 207). She stated that she was severely depressed (Tr. 207). Dr. Levin provided Plaintiff with samples of Lexapro (Tr. 207).

Two days after the injection, Plaintiff told Dr. Levin that the injection did not help her pain "whatsoever" (Tr. 209). Dr. Levin administered a caudal epidural steroid injection (Tr. 209). Two weeks later, at the end of October 2005, Plaintiff told Dr. Levin that the epidural steroid injection significantly improved her pain, and that 60 to 70 percent of her pain was gone (Tr. 210). She took Percocet on an as-needed basis (Tr. 210). Dr. Levin administered a second caudal epidural steroid injection (Tr. 210), which did not help her pain (Tr. 211). She took Percocet and Lexapro, and rated her pain as a 6 on a 10-point pain scale (Tr. 211). She was able to work and

stated that her work required a lot of walking and sitting (Tr. 211). Dr. Levin stopped the Percocet, continued to Lexapro, and prescribed OxyContin (Tr. 211).

At her follow-up in January 2006, Plaintiff reported significant improvement in her pain and that it was 50 percent better (Tr. 212). She had stopped taking Lexapro and took Tylenol on an as-needed basis (Tr. 212). In February 2006, she reported that her low back pain was significantly worse with rainy weather and activity (Tr. 213). In March 2006, she told Dr. Levin that her pain continued to significantly improve and that she was noticing additional improvement since starting Lyrica (Tr. 214).

In January and June 2007, Plaintiff reported she was doing well with her current medications and that her pain was pretty well-controlled (Tr. 269-70). She stated in June 2007 that she continued to work full-time (Tr. 269).

In August 2007, Plaintiff complained to Dr. Levin of new onset of neck and left arm pain (Tr. 268). Dr. Levin ordered an MRI (Tr. 268), which showed some scattered, minimal degenerative changes (Tr. 242). Dr. Levin assessed this as mild disc/osteophyte complex at the C7-T1 level, otherwise fairly normal (Tr. 265). He treated Plaintiff with medication and injections (Tr. 262-68). In early November 2007, Plaintiff reported that she had complete resolution of her pain following a C5-6 transforaminal epidural steroid injection (Tr. 261). In January 2008, Plaintiff told Dr. Levin that the pain medication had helped her tremendously and that she had been able to get back to work and resume almost all of her normal activities (Tr. 258). Dr. Levin informed Plaintiff that he was relocating from the practice and that she would need to find another physician to prescribe her opioid pain medications (Tr. 258).

Plaintiff returned to Dr. Wiles four months later in May 2008, and complained of back pain and leg discomfort (Tr. 264). Dr. Wiles noted that she continued to work and was a single mother (Tr. 264). Upon physical examination, she had some tenderness in her low back and some pain with range of motion, but Dr. Wiles noted that her range of motion was not severely limited (Tr. 264). She had good strength in her lower extremities and her gait was nonantalgic (Tr. 264). Dr. Wiles referred Plaintiff to Marc Valley, M.D., a chronic pain specialist with his practice, for narcotic and chronic pain management (Tr. 264).

The next month, in June 2008, Dr. Valley assessed post-laminotomy syndrome of the lumbar spine, degenerative disk disease of the lumbar spine, and lumbar radiculopathy (Tr. 257). Upon physical examination, Plaintiff had significant muscle spasms in the lumbar spine, decreased range of motion in the lumbar spine, and positive straight leg raise (Tr. 257). He recommended the use of a transcutaneous electrical nerve stimulator (TENS) unit (Tr. 257).

When Plaintiff returned in September 2008, she reported that the TENS unit made her muscle spasms worse, and Dr. Valley decided to hold off on the spinal cord stimulator trial (Tr. 254). Her psychological evaluation had revealed major depression and he referred her for further psychiatric evaluation and treatment (Tr. 254). Her physical examination continued to show muscle spasms, decreased range of motion, and tenderness to palpation (Tr. 254).

Objective evidence from physical examinations in October and November

4

2008 showed that Plaintiff had a normal gait, negative straight leg raise test, normal 5/5 muscle strength, normal reflexes, and normal range of motion in her lumbar spine (Tr. 234-37). At these examinations, Plaintiff reported that her pain was a 7 on a 10-point pain scale (Tr. 236). In December 2008, Plaintiff reported that her pain was a 10 on a 10-point pain scale, meaning that her pain was the most excruciating pain imaginable (Tr. 232). Her gait was normal (Tr. 232). She had no tenderness to palpation, no pain, and normal sensation (Tr. 232). Her range of motion was normal (Tr. 232). Her physical examination was unchanged in January 2009, though Dr. Valley noted muscle spasms (Tr. 230). Plaintiff reported that her medications were doing great, but stated that she could not tolerate standing for 12 hour shifts in one spot (Tr. 229). Dr. Valley adjusted her work parameters due to her subjective complaint that she could not do a standing 12 hour shift daily (Tr. 229). At her appointment in February 2009, Plaintiff reported that she had lost her insurance and Dr. Valley indicated that he would work around her schedule (Tr. 226). Her physical examination was unchanged (Tr. 226).

At her appointment in May 2009, Plaintiff reported that she had been off of her medications since early March (Tr. 224). Her husband had just lost his job and would likely lose his insurance (Tr. 224). She had stopped seeing a counselor and reported being severely depressed (Tr. 224). Her physical examination was unchanged (Tr. 226). The next month, in June 2009, Plaintiff told Dr. Valley that she was not taking any medications and wished to proceed with the spinal cord stimulator trial (Tr. 220). The TENS unit had caused muscle spasms and shooting pain and Plaintiff was informed that the trial may produce the same sensation (Tr. 220). Her gait was normal and she had no muscle tenderness (Tr. 220-21). Examination of the spine revealed normal range of motion, no pain, and normal sensation (Tr. 221).

In November 2009, Dr. Valley stated that Plaintiff had been a patient of his practice since February 2004 and had underwent a lumbar fusion at two levels in June 2004 (Tr. 317). He opined that Plaintiff since January 2009, Plaintiff had been released to work at light duty, no more than one to two hours per day (Tr. 317). She could not lift greater than 20 pounds and could not participate in prolonged standing or repetitive bending (Tr. 317). He opined that these limitations were permanent and that he expected Plaintiff's condition to deteriorate (Tr. 317).

Plaintiff sought primary care from Wesley Hanson, M.D., with the Rural Health Services Consortium, Inc. (Tr. 434). In August 2010, Plaintiff requested a referral for pain management (Tr. 434). In January 2011, she requested that disability paperwork be completed on her behalf (Tr. 433).

Eight months later, in August 2011, she complained to Dr. Hanson of depression and back pain (Tr. 430). She reported that due to her mental limitations, it was extremely difficult for her to meet home, work, or social obligations (Tr. 430). She reported deep and throbbing back pain in her neck, hips, and lower back, which was worsened by bending, flexion, sitting, and standing (Tr. 430). Dr. Hanson assessed bipolar disorder and low back pain (Tr. 431).

Five months later, in March 2012, Plaintiff returned to Dr. Hanson for a

5

"meds" visit (Tr. 427). She did not have insurance (Tr. 427). Her only medication was Seroquel for depression (Tr. 427). She rated her pain as an 8 on a 10-point pain scale (Tr. 428). No physical examination findings were noted (Tr. 428).

One year later, in March 2013, she returned to her primary care physician and reported aching and throbbing pain (Tr. 425). She stated that she had not been on any medications during the past one to two years and that her symptoms were causing her to miss school (Tr. 425). She said that she had done well on Lyrica in the past, which Dr. Hanson prescribed (Tr. 425). In August 2013, she reported that her medication was helping her bipolar symptoms, and she requested patient assistance and samples of medications for fibromyalgia (Tr. 441).

In October 2013, at the request of Plaintiff's attorney, Rebekah Crump-Austin, M.D., evaluated Plaintiff's complaints of pain and depression (Tr. 444-45). Upon examination, Plaintiff's lumbar spine was mildly tender to palpation and there were mild lumbar paraspinous muscle spasms (Tr. 444-45). Plaintiff had no significant limitations in the cervical spine, and decreased lateral bending in the lumbar spine (Tr. 445). Sensation was decreased to light touch/pinprick below the left midcalf, and she walked with an antalgic, wide based gait (Tr. 445).

Dr. Crump-Austin opined that Plaintiff could lift and carry less than 10 pounds, be on her feet less than 1 hour at one time and 3 hours total, sit for 2 hours at one time and 4 hours total, and could alternate between sitting and standing for 8 hours during the day without having to lie down (Tr. 446). She could not push or pull arm or leg controls because it would exacerbate her back pain and spasms (Tr. 446). She could never squat, climb, or crawl (Tr. 446). She could occasionally bend and reach (Tr. 446). Her ability to be around unprotected heights was severely impaired and her ability to be around moving machinery was moderately impaired (Tr. 446). She was moderately impaired in her ability to drive automotive equipment because of pain medication requirement (Tr. 446).

[Doc. 19, pgs. 3-10]

At the administrative hearing on November 13, 2013, the ALJ called Mr. Bentley Hankins, a Vocational Expert ["VE"]. He asked him to imagine a person of plaintiff's age, vocational experience and education who "could do light work, frequent ramps and stairs, frequent balancing, no ropes, ladders, scaffolds, no stooping, kneeling, crouching, or crawling, avoid even moderate exposure to hazards...and limited to simple, unskilled work." The VE identified the jobs of cashier, with 1.6 to 1.65 million jobs in the nation and 28 to 30 thousand in Tennessee; photocopy machine operator, with 25 to 26 thousand in the nation

6

and 200 to 225 in Tennessee; and production inspector, with 12,000 to 12,500 in the nation and 275 to 300 in Tennessee. (Tr. 353). Under questioning by plaintiff's counsel regarding the assessment of Dr. Crump-Austin, the examining neurosurgeon, the VE testified that if plaintiff had those limitations it would be "doubtful" that they could engage in substantial gainful activity. (Tr. 356-57).

On January 17, 2014, the ALJ rendered the hearing decision in the present case. He first noted that the district court and the Appeals Council had directed the ALJ "to fully address the opinion of Dr. Valley and order a consultative physical examination to determine the plaintiff's condition and restrictions on her work related activities. The Court remand order also directed the claimant to submit any further evidence." In a footnote, the ALJ noted that "after reviewing the evidence of record, a physical consultative examination is not necessary, as the evidence establishes sufficient support for the determined residual functional capacity, as discussed elsewhere in this decision. Included in this evidence is an independent medical examination performed by a neurosurgeon, which was completed in October 2013." (Tr. 321) This is of course referring to the report of Dr. Crump-Austin dated October 22, 2013 (Tr. 444-447).

The ALJ found that the plaintiff had severe impairments of status post lumbar fusion, cervical degenerative disc disease, fibromyalgia, and an affective disorder (depression). (Tr. 323). He noted her daily activities as reported by her, which she stated consisted of spending ninety percent of her day in bed with her husband doing the laundry, cooking, house cleaning and shopping. She reported she dressed, bathed, groomed, fed herself and used the toilet herself. He noted she could cook a meal for her child if her husband was not home. (Tr.

323).

After finding that the plaintiff did not meet or equal one of the Listings, he stated that her residual functional capacity ["RFC"] was such that she could perform light work, "except the claimant can frequently climb ramps and stairs, frequently balance; no climbing of ropes, ladders, or scaffolds; no stooping, kneeling, crouching, or crawling; and she must avoid even moderate exposure to hazards. Mentally, she is limited to simple, unskilled work." (Tr. 325).

The ALJ noted that the plaintiff testified at the hearing that "although she returned to work following her back surgery, she had to stop because the pain progressively worsened and she was unable to sit down and stand up, as they caused severe pain even with pain medications....she also testified she has muscle spasms, which are getting worse, and she is getting to where her husband must pick her up out of bed." (Tr. 326).

The ALJ then addressed the plaintiff's credibility. He found she was "not entirely credible." With respect to her description of her extremely limited daily activities, he found that "two factors" weighed against "considering these allegations to be strong evidence in favor of finding the claimant disabled." The first factor was that "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty." Second, even if those activities are as limited as she describes them, "it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence during the period at issue, as well as other factors discussed in this decision." (Tr. 327).

The ALJ then noted that plaintiff's "pain was present at approximately the same level

of severity (if not worse) prior to the alleged onset date..." and "the fact that the impairment did not prevent the claimant from working at that time strongly suggests that it would not currently prevent work." He also noted that plaintiff had "generally" only received "conservative treatment," and that there were gaps in treatment which he perceived meant her "symptoms might not have been as serious as...alleged." He concluded saying that he "finds the claimant's allegations of disability not credible and assigns them little weight." (Tr. 327).

He then discussed the treatment history from East Tennessee Brain and Spine Center which is the practice in which Dr. Valley is employed and which began treating the plaintiff in 2004. He recounted some of the treatment and the notes which pointed out periods of decreased pain. He noted she was working full time in June 2007, but that in May of 2008 they diagnosed her as having "failed back syndrome." (Tr. 327).

The ALJ continued to recount the treatment at East Tennessee Brain and Spine Center from October 2008 through November 2009, noting relatively normal objective findings until January 2009, when the plaintiff reported increased pain. He noted she had lost her insurance in 2009 and could not follow up with the SCS trial (Tr. 328).

He then recounted the assessment of Dr. Valley, and noted that Dr. Valley had treated the plaintiff from February of 2004 through November of 2009. The ALJ stated that "despite the relatively normal findings presented in the treatment records, the doctor indicated that as of January 2009 the claimant was released with permanent restrictions of working no more than one to two hour days, no lifting greater than twenty pounds, and no prolonged standing or repetitive bending." (Tr. 328).

9

The ALJ noted the state agency physical reports of September 2009 and February of 2010 which indicated "the claimant could work at the light exertional level with frequent posturals." (Tr. 328).

He also discussed the October 2013 exam by Dr. Crump-Austin. He noted that Dr. Crump-Austin observed that the plaintiff's lumbar spine was tender to palpation and that she observed mild paraspinous muscle spasms. The ALJ also mentioned that Dr. Crump-Austin observed decreased lateral bending in the lumbar spine and decreased sensation below the midcalf on the left with an antalgic, wide based gate. He noted Dr. Crump-Austin's opinion that plaintiff's "activities of daily living and ability to work were significantly limited secondary to her ongoing pain syndrome." He then recounted Dr. Crump-Austin's assessment of the plaintiff's ability to perform work related activities as described in the summary of medical evidence set out above. (Tr. 330).

He then discussed the weight he gave to various medical opinions. He gave little weight to Dr. Valley saying "the opinion is inconsistent with the evidence of record, including the generally benign objective findings during examinations as noted above." He noted that plaintiff's "conditions were generally controlled with medications to the point...the claimant could continue with work activity." He stated that Dr. Valley reported in June 2009, that the plaintiff was off medication and that an examination of her spine revealed a normal range of motion, no tenderness to palpitation, no pain, and normal sensation. He found those findings inconsistent with Dr. Valley's November 2009 opinion. He then stated "the undersigned notes that the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he sympathizes for one reason or another." He

10

pointed out "that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension."  While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case, where the claimant was losing her insurance and was unable to schedule a follow-up appointment."  (Tr. 330-331).

He then gave little weight to the report of Dr. Crump-Austin, finding that her "opinion is inconsistent with the evidence of record...including the generally conservative treatment during the period at issue, multiple examinations revealing normal findings, and the gaps in treatment."  He also noted that this was a one-time examination.  (Tr. 331).

Based upon the testimony of the VE in response to his hypothetical, the ALJ found that a significant number of jobs existed which the plaintiff could perform.  Accordingly, he found that she was not disabled.  (Tr. 331-332).

Plaintiff asserts that the ALJ did not follow the remand order of this Court. Specifically, she says that he failed to fully address the opinion of Dr. Valley, and also did not obtain a consultative examination to determine the plaintiff's condition and restrictions for work-related activities.  Because of this, plaintiff asserts that there was a lack of substantial evidence to support his RFC finding or his question to the VE, and thus, his ultimate determination that the plaintiff was not disabled.

At the outset this Court, whose report and recommendation that those things be done was adopted by the district judge, does not care in the slightest whether the Commissioner

followed the remand order to the letter or not, so long as the plaintiff's case was adjudicated in conformity with the regulations and applicable case law. In other words, if there is substantial evidence to support the ALJ's findings, and if the law was followed, a failure to obtain a consultative examination by itself is not "offensive" to the Court. A proper, well-supported adjudication is what matters.

It is somewhat necessary to examine why the original lawsuit, Case No. 2:12-CV-73, ordered a remand to the Commissioner in the first place.

In the report and recommendation in that case, this Court noted the findings of the prior ALJ and the deficiencies with his adjudication as follows:

> He stated plaintiff "has not received the type of medical treatment which one would expect for a totally disabled individual. Although the claimant received treatment for the allegedly disabling impairments, that treatment has been routine and/or conservative in nature. The record reflects that the claimant has received no medication treatment after November 2009. If the claimant did not seek treatment or purchase medications because she could not afford to, she could have sought treatment from an agency within the region in which she resides that would treat her and require her to pay only as she is able, if she meets such agency's criteria. There is no indication that the claimant had attempted to obtain such treatment.... On November 11, 2009, Dr. Valley opined that the claimant was capable of performing light work activity with no prolonged standing and no repetitive bending. ***The record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision***." (Tr. 17) [emphasis added].

Case No. 2:12-CV-73, Doc. 16, pgs. 4-5].

This Court made the following observations regarding the problem with the prior ALJ's analysis:

> It is irrefutable that the ALJ did not include Dr. Valley's restriction on prolonged standing and repetitive bending in his hypothetical to VE. It is likewise irrefutable that the ALJ did not even mention in his hearing decision Dr. Valley's

12

restriction that plaintiff could only perform light work one to two hours per day. It is also irrefutable that the ALJ did not explain his reasons for the weight given to Dr. Valley's opinion, or for his rejection of any part thereof.

To be sure, a bald opinion of a treating physician is not entitled to be given controlling weight by an ALJ. Social Security Ruling 96-2p explains the process to be used by an ALJ in evaluating such evidence. To be entitled to controlling weight, it must be from a "treating source," it must be a "medical opinion," it must be "well supported" by "medically acceptable" clinical and laboratory diagnostic techniques," and it must be "not inconsistent" with the other "substantial evidence" in the record. *Id.*, pg. 2. This Ruling also mirrors the requirements of 20 CFR §§ 404.1527 and 416.927, compelling the ALJ to set out "specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record..." Most importantly, the ALJ's reasons "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*, at 4.

...

This Court has no idea whether the ALJ knew or not of Dr. Valley's opinion on how long the plaintiff could perform light work a day. Likewise, it has no idea why the ALJ mentioned the opined restriction on standing and bending but neither included it in his RFC finding nor explained the consideration given to it. These are not minor requirements in the adjudicatory process. In the opinion of the Court, the Commissioner's position is not substantially justified.

*Id.,* Pgs. 6-8.

Thus, the Court recommended that the case be remanded because the treating physician had opined a restriction contrary to the ALJ's RFC which the ALJ did not note, much less explain the reasons why he disagreed with it. However, this Court did not give *carte blanche* to Dr. Valley's opinion, noting as follows:

At the same time, Dr. Valley's notes are confusing. For example, the treatment and examination note of June 17, 2009, clearly indicates the plaintiff is there for a follow up appointment regarding her long history of back pain going back to her lumbar fusion in 2004. However, the record states that the physical examination of her lumbosacral spine revealed "normal range of motion, no tenderness to palpation, no pain and normal sensation." (Tr. 220-21). Yet, five months later, he opined that she could only perform limited light work for one to two hours per day.

*Id.,* Pgs. 8-9.

While no reason, much less a legitimate one, had been given in the prior case why that portion of Dr. Valley's assessment was not entitled to any deference, there was also a medical "void" to be filled as to exactly what the plaintiff's restrictions were. That was the reason for ordering the consultative examination.

However, the present ALJ has pointed to a medical opinion which fills the "void," and given it some weight. The ALJ noted that the State Agency physicians had opined that the plaintiff "could work at the light exertional level with frequent posturals." (Tr. 328). The first of these reports predated the November 2009 assessment of Dr. Valley (Tr 271-279), and thus could not take his assessment into account. The second one, from Dr. Michael N. Ryan, dated February 22, 2010, states that plaintiff's "additional information does not support any further limitations." This assessment states the initial assessment was reviewed and "affirmed as written." (Tr. 315).

The opinion of a State Agency physician can be given credence over the opinion of a treating physician if there is inconsistency or lack of foundation in the records of the treating physician for the opined limitations, such as those pointed out in the opinion of the present ALJ and in the previous opinion of this Court quoted above. *See, Combs v. Commissioner of Soc. Sec.,* 459 F.3d 640 (6th Cir. 2006), and *Cutlip v. Secretary of H.H.S.,* 25 F.3d 284 (6th Cir. 1994).

It is of course true that Dr. Crump-Austin, a one time examiner, submitted a report which basically supports the assessment of Dr. Valley. However, the adjudicative process is not a "majority rules" situation. The ALJ is charged with weighing the evidence. While

the previous ALJ's findings were murky, the present ALJ has stated his reasons for discounting the opinions of both Drs. Valley and Crump-Austin. The opinion of Dr. Ryan medically supports his view, and constitutes substantial evidence.

This is a difficult case. The plaintiff obviously has severe impairments. But there is substantial evidence that her restrictions would allow her to engage in a substantial number of jobs. Accordingly, it is respectfully recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 14] be DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 18] be GRANTED.[1]

Respectfully submitted,

  s/ Dennis H. Inman
United States Magistrate Judge

---

[1]Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).